**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>vs.<br><br>Ryan Galal VanDyck,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No.  CR 15-742-TUC-CKJ

**ORDER**

Pending before the Court are the Motion to Suppress Due to Illegal Search Warrant Unsupported by Probable Cause (Doc. 87) and the Motion to Suppress Due to Illegal Grand Jury Subpoena (Doc. 88) filed by Defendant Ryan Galal VanDyck ("VanDyck").  Evidence and argument were presented to the Court on May 16, 2016.

I. *Factual Background*

TPD Sergeant Shawn Holewinski ("Sgt. Holewinski") testified that, at relevant times, he was a detective assigned to the internet crimes again children unit.  In May of 2015, his unit received a tip from the National Center for Missing and Exploited Children ("NCMEC").  NCMEC had received an April 10, 2014, tip from American Online that an alleged image of child pornography had been uploaded to an internet protocol address through an email named doudykid@aim.com.  The IP address was geo-located to Tucson, Arizona and was serviced by Comcast Cable Company ("Comcast").  The information was memorialized in a Cyber Tipline Report.

1    Sgt. Holewinski testified that, on May 28, 2014, he requested a Grand Jury Subpoena
2    from the Pima County Grand Jury through the Pima County Attorney's Office.  The
3    subpoena was issued, sent to Comcast Legal Response Center in New Jersey, and requested
4    "subscriber information to include the name, address, and phone numbers related to the user
5    of IP address 69.244.63.8." Ex. 3.[1]  The subpoena included, "If you fail to appear as ordered,
6    the court may issue a warrant for your arrest."  *Id.*

7    Comcast provided the information.  It listed the subscriber name as Premier
8    Landscaping Service located at 3008 W. Sun Ranch Trail, Tucson, Arizona.  The email
9    associated with the account was premierland@comcast.net. Detective Daniel Barry ("Det.
10    Barry") testified that further investigation revealed VanDyck and Breana VanDyck were the
11    primary residents at the address.

12    Det. Barry testified that his investigation revealed that, in May 2011, a complaint was
13    filed with the Pima County Sheriff's Office by the mother of a 13-year-old victim.  *See also*
14    Ex. 9.  The mother had obtained an injunction against harassment against VanDyck after she
15    learned of an inappropriate relationship between VanDyck and her daughter.  According to
16    the initial report, the mother was aware that her daughter and VanDyck were exchanging
17    emails but her observations at her daughter's birthday party led her to think that VanDyck
18    was pursuing an inappropriate relationship with her daughter.  After the injunction was in
19    place, the mother believed the victim continued to receive emails from VanDyck using an
20    alias.

21    Det. Barry also testified that, in November 2005, the Pima County Sheriff's Office
22    investigated VanDyck for impersonating a police officer. *See also* Ex. 7.  While conducting
23    a consent search for the gun used while impersonating an officer, deputies found photos of
24    children ages seven to ten under VanDyck's bed.  The children in the photos were not
25    wearing any clothing and their genitalia were exposed.  A consensual search of VanDyck's

26

27    ———————————
28    [1]Citations to exhibits herein refer to the exhibits admitted into evidence during the
May 16, 2016 hearing.

computers did not reveal the existence of images of child pornography.

Det. Barry provided a probable cause statement in support of a request for a search warrant. He included a summary of his training and experience, including over 300 hours of training relating to the investigation of internet crimes against children. Det. Barry's extensive experience and training has not been disputed. Additionally, Det. Barry included VanDyck's prior law enforcement contacts. He testified that, in his experience, there is a correlation between the possession of child erotica and the possession of child pornography. A search warrant was issued on September 3, 2014. Sgt. Holewinski testified that Detective Gregory Wright ("Det. Wright") advised him that Van Dyck was out of town. Det. Barry testified that Det. Wright provided information that Breanna VanDyck had stated that VanDyck would not be home until the 4th. On September 8, 2014, Sgt. Holewinski requested an extension of time to serve the search; the extension was granted.

The warrant was executed on September 9, 2014, approximately five months after the original tip was received. After searching an external hard drive, police discovered a video. The Government alleges this video depicts the attempted production of child pornography (Count 1). This video led detectives to Idaho, where VanDyck's co-defendant resided. A second search warrant was executed on April 10, 2015 – another computer in VanDyck's possession allegedly contained child pornography (Count 2).

VanDyck has filed a Motion to Suppress Due to Illegal Search Warrant Unsupported by Probable Cause (Doc. 87) and a Motion to Suppress Due to Illegal Grand Jury Subpoena (Doc. 88). Responses and replies have been filed.

II. *Motion to Suppress Due to Illegal Search Warrant Unsupported by Probable Cause* (Doc. 87)

A. *Probable Cause*

VanDyck asserts the 2014 warrant was not supported by probable cause. A magistrate judge or a state court of record may issue a warrant authorizing the search for and seizure of a person or property within a federal district upon a showing that probable cause exists to

1   believe that contraband or evidence will be found. Fed. R. Crim. P. 41.  The test to be applied

2   is whether, using common sense and considering the totality of the circumstances, a

3   magistrate judge can reasonably conclude that there is a "fair probability" that contraband or

4   evidence of a crime will be found in the place to be searched.  *Illinois v. Gates*, 462 U.S. 213,

5   238 (1983).  "[A] magistrate judge must look to the 'totality of the circumstances' to

6   determine whether the supporting affidavit establishes probable cause."  *United States v.*

7   *Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) (quoting *Gates*, 462 U.S. at 230).  "Under the

8   totality of the circumstances test, otherwise innocent behavior may be indicative of

9   criminality when viewed in context . . . . [I]ssuing judges may rely on the training and

10  experience of affiant police officers."  *United States v. Chavez-Miranda*, 306 F.3d 973, 978

11  (9th Cir. 2002).  "[A]n issuing magistrate may draw reasonable inferences about where

12  evidence is likely to be kept, based on the nature of the evidence and the type of offense

13  alleged."  *United States v. Fernandez* , 388 F.3d 1199, 1253 (9th Cir. 2004) ( modified, 425

14  F.3d 1248 (9th Cir. 2005)) ("[i]n the case of drug dealers, evidence is likely to be found

15  where the dealers live.") (citations omitted).

16      A magistrate judge's finding of probable cause is entitled to great deference.  *United*

17  *States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013).  "[T]he duty of a reviewing court

18  is simply to ensure that the magistrate had a substantial basis for concluding that probable

19  cause existed."  *Gates*, U.S. at 238–39.    "Courts should not invalidate warrants by

20  interpreting affidavits in a hypertechnical, rather than a common-sense manner." *Id*. at 236.

21   As long as the magistrate judge had a substantial basis for concluding "that a search would

22  uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id*.

23      VanDyck argues that the information contained in the affidavit was stale.  While

24  VanDyck points out that there is no arbitrary time limit on how old the factual information

25  contained in an affidavit may be, *see e.g., State v. Kasold*, 110 Ariz. 563, 521 P.2d 995

26  (1974); *United States v. Guinn*, 454 F.2d 29 (5th Cir. 1972), *cert. denied*, 407 U.S. 911

27  (1972), he also points out that the question of staleness depends more on the nature of the

28  activity than on the number of days that have elapsed since the factual information was

1   gathered.  *See e.g., State v. Smith*, 122 Ariz. 58, 593 P.2d 281 (1979); *United States v.*

2   *Weinrich*, 586 F.2d 481 (5th Cir. 1978), *cert. denied*, 441 U.S. 927 (1979).

3          Indeed, the mere lapse of time is not controlling.  *United States v. Lacy*, 119 F.3d 742,

4   745 (9th Cir. 1997).  Rather, staleness must be evaluated "'in light of the particular facts of

5   the case and the nature of the criminal activity and property sought.'"  *Id*. at 745 (citation

6   omitted).  In *Lacy*, the fact that child pornography had been downloaded from a computer ten

7   months earlier did not cause seizure of hard drives and disks to be based upon impermissibly

8   stale information where reason existed to believe items were still in the residence.

9          In arguing the information relied upon was stale because the warrant was not issued

10  until approximately five months after the original tip, VanDyck points to two papers

11  discussing child pornography trafficking.  *See* Wolak, J., et al. Measuring a year of child

12  pornography trafficking by U.S. computers on a peer-to-peer network. *Child Abuse &*

13  *Neglect* (2013), http://dx.doi.org/10.1016/j.chiabu.2013.10.018; Hurley, R., *et al.*,

14  Measurement and Analysis of Child Pornography Trafficking, https://web.cs.umass.edu/

15  publication/docs/2013/UM-CS-2013-007.pdf.  VanDyck argues these papers show that

16  people do not maintain child pornography for long periods of time, contradicting the search

17  warrant affidavit in this case.

18         However, the papers relied upon by VanDyck discussed how often individuals file

19  share, rather than how long an individual keeps child pornography.  For example, Wolak

20  states that "more than 80% of U.S. computers trafficking in [child pornography] were

21  observed with fewer than 10 known [child pornography] files (83%, n = 202,116) or sharing

22  such files for fewer than 10 days (99%, n = 216,990)."  Wolak, p. 6.  However, the data table

23  in support of this statement refers to "Known [child pornography] files shared during study

24  year per computer" and "Days sharing known [child pornography] files[.]"  *Id*. at p. 6, Table

25  1.  Similarly, an example from Hurley also indicates that VanDyck's conclusion is incorrect.

26  Hurley states:

27          Table 6: Month-to-month changes in GUID libraries. "Increase" or "decrease" means
28          that the GUID's library (not corpus) size for the month monotonically increased or
            decreased over time; "varied" means the GUID's library size fluctuated.Tor and

relayed GUIDs were generally more active in modifying their libraries than ordinary GUIDs; further, they tended to increase their library size consistently over time.

Hurley, p. 11, Table 6 (emphasis added).  The correlating table indicates that approximately 80% of all observed libraries neither increase nor decrease.

VanDyck's assertion that the studies dispute the affidavit as to staleness is simply not supported.  Rather, the pattern of behavior beginning in 2005, as shown to Det. Barry as he investigated, provided ample reason to believe the evidence sought was still in VanDyck's residence.   This, in conjunction with the detective's training and experience, established probable cause.  Indeed, this is recognized by case law.  *See e.g. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (while the court was unwilling to assume collectors of child pornography keep their materials indefinitely, the nature of the crime as set forth in the warrant allowed for a 10-month gap between defendant's access of child pornography bulletin board and the issuance of search warrant); *see also United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013) (state court judge had a substantial basis for its reason to believe digital child pornography files would be present at Schesso's residence 20 months after a child pornography video was downloaded to an IP address assigned to Schesso's residence).

The alleged staleness does not warrant a determination that the issuing judge did not have a substantial basis for concluding "that a search would uncover evidence of wrongdoing[.]"  *Gates*, U.S. at 238–39.

VanDyck also argues that the IP address was insufficient to establish probable cause. However, VanDyck's history contributed to the finding of probable cause – i.e., it was not just the IP address that was used to establish probable cause.  Moreover, the IP address, while not definitively tied to VanDyck, is connected to VanDyck.  This case is similar to *United States v. Hay*, 231 F.3d 630 (9th Cir. 2000), where the court found a download to a computer to Hay's apartment, along with his history, was sufficient to sustain the issuance of a warrant. Here, the only difference is that, to the knowledge of the officers,  the use of the computer was not limited to VanDyck.  At a minimum, the potential users appear to be limited to the household.  There was a substantial basis for the judge to conclude the search would uncover

1    evidence of wrongdoing.

2         VanDyck also argues that the affidavit was insufficient because of the "expert

3    testimony" it included.  Specifically, the detective summarized characteristics of persons who

4    possess and distribute child pornography.  VanDyck asserts the affidavit failed to establish

5    any viable link between himself and those characteristics.  Van Dyck argues that such

6    information is not relevant.  However:

7         It is well established that expert opinion may be presented in a search warrant
         affidavit. But if the government presents expert opinion about the behavior of a
8         particular class of persons, for the opinion to have any relevance, the affidavit must
         lay a foundation which shows that the person subject to the search is a member of the
9         class.

10   *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1991).  Where there is no such link,

11   probable cause does not exist:

12        It goes without saying that the government could not search Weber's house for
         evidence to prove Weber was a collector merely by alleging he was a collector. Had
13        [the agent] taken the time and conscientiously drafted an affidavit tailored to what he
         knew about Weber rather than submitting an affidavit describing generally [sic]
14        information about different types of perverts who commit sex crimes against children,
         he might have realized that he did not know enough about Weber to state that there
15        was reason to believe that Weber was one of the "types" described or possessed any
         of the habits ascribed to such types. He might have known that a blunderbuss warrant
16        was unjustified.

17   *Id*.  In *Weber*, the information alleged to have supported a search warrant consisted of a two

18   year old incident in which the Customs Service seized a parcel addressed to a P. Webber at

19   the residence in which Weber later resided; "[t]he parcel contained two pieces of advertising

20   material, which the customs inspector concluded 'apparently depict[ed] the sexual

21   exploitation of children.' . . . Customs made no determination as to whether Weber had

22   ordered the advertising material or whether the advertisements had been sent unsolicited."

23   *Id*.  Additionally, the defendant was alleged to have ordered pictures featuring "boys and

24   girls in sex action" from a fictitious entity that was created by law enforcement as part of a

25   reverse "sting" operation and a general description of the proclivities of pedophiles.  *Id*. at

26   1340.  The detective seeking the warrant stated he expected to find the photographs from the

27   controlled delivery and other items of child pornography, information about others dealing

28   in child pornography, and information relating to the ordering of child pornography.  *Id*.

However, unlike VanDyck, the history of the defendant in *Weber* consisted of one incident in which it was not known whether that defendant had even solicited the advertising material.  Here, VanDyck's history does show a sexual interest in minor children.  Moreover, this case is more similar to *Hay*.  In *Hay* the defendant had a history of contacts with children; similarly, VanDyck has a history of showing a sexual interest in children.  Both investigations began with the identification of an internet address.  The defendant in *Hay* argued that there was no evidence that he fell within a class of persons likely to collect and traffic in child pornography to establish a link with the characteristics of persons who collect and traffic child pornography.  However, the court recognized that the appropriate inquiry "is whether there was reasonable cause to believe the 19 [child pornography files] were located somewhere in Hay's computer, on electronic storage devices or on printouts, in his apartment.  It is well-established that a location can be searched for evidence of a crime even if there is no probable cause to arrest the person at the location." *Hay*, 231 F.3d at 635 (citing *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that specific 'things' to be searched for and seized are located on the property to which entry is sought.")).  Moreover, as to the type of information of which VanDyck complains, the court stated:

> [T]he boilerplate in [the detective's] affidavit provides context for Evans's transfer of 19 images to Hay's Internet address, and forms the basis upon which the magistrate judge could plausibly conclude that those files were still on the premises. It sets forth relevant background information about how child pornography is traded and distributed over the Internet: through use of chat rooms to establish contacts, followed by transmission or trading of images. It points out that the computer's ability to store images in digital form makes it an ideal repository for child pornography. The affidavit also explains that the computer has become one of the preferred methods of distribution of child pornographic materials and opines, based upon Galante's experience and that of colleagues, that searches and seizures of evidence from computers requires agents to seize all parts of a computer system to be processed later by a qualified computer expert. *See United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir.1995) ("[W]hen interpreting seemingly innocent conduct, the court issuing the warrant is entitled to rely on the training and experience of police officers."). In sum, the affidavit (including "boilerplate" based on the agents' experience), provides a substantial basis for the probable cause determination.

*Hay*, 231 F.3d at 636.  The affidavit in this case is similar to that used in *Hay*.  There was a

1   substantial basis for the judge to conclude probable cause existed that the search would
2   uncover evidence of wrongdoing.

3

4   　　　B.  *Review of Search Warrant - Factual Misrepresentations*

5   　　　VanDyck also argues that Detective Barry recklessly disregarded the truth of certain
6   facts in the affidavit.  An inquiry into the accuracy of the statements contained in a search
7   warrant affidavit is governed by *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).  The
8   question to be answered in a *Franks* hearing is whether the affidavit contained deliberately
9   or recklessly false statements without which probable cause would not have existed.  *Franks*,
10  438 U.S. at 155–56, 171–72; *see also United States v. Long*, 301 F.3d 1095, 1101 (9th Cir.
11  2002) (suppression pursuant to *Franks* not required where probable cause existed after
12  warrant was "purged of intentionally or recklessly false statements," police mistakes were
13  made in good faith, attempts were made to correct the mistakes by contacting the magistrate
14  judge, and certain evidence was in plain view); *United States v. Elliott*, 322 F.3d 710, 716
15  (9th Cir. 2003) (describing two-step analysis: "First, . . . whether any erroneous statements
16  or omissions in the search warrant affidavit were made knowingly and intentionally, or with
17  reckless disregard for the truth," and, if so, "whether with the affidavit's false material set to
18  one side, the affidavit's remaining content is insufficient to establish probable cause.")
19  (internal quotations and citations omitted).

20  　　　"There is … a presumption of validity with respect to the affidavit supporting the
21  search warrant."  *Franks*, 438 U.S. at 171.  If a defendant establishes a *Franks* violation by
22  a preponderance of the evidence, "the search warrant must be voided and the fruits of the
23  search excluded to the same extent as if probable cause was lacking on the face of the
24  affidavit."  *Franks*, 438 U.S. at 156.

25  　　　VanDyck asserts a variety of statements were false.  First, VanDyck asserts there was
26  no basis for the statement regarding the 2011 investigation of VanDyck for an inappropriate
27  relationship with a child.  However, the testimony of the officer and the police reports
28  support the detective's statement.

1       VanDyck also asserts the detective's inclusion of the 2005 incident of possession of

2   child erotica was stale and irrelevant to the current investigation.  However, in light of the

3   detective's statement that, in his training and experience, he is aware such items are typically

4   kept for a long time (and case law concurs), this incident is relevant.  Further, the Court finds

5   the detective's inclusion of the incident does not constitute a false statement.

6       VanDyck also asserts the detective's use of "images" when only one image was

7   known warrants suppression.  However, at other places in the affidavit, an "image," "single

8   file," and "image file" all referred to.  In context, the Court finds the statement was not

9   knowingly and intentionally false or made with reckless disregard for the truth.

10      VanDyck also complains of an extension of the warrant based on the detective

11  allegedly lying to judge by telling him VanDyck was out of town when he was not.  Not only

12  was there a good faith basis for the statement, but any false impression left by the statement

13  was not material to the issuance of the search warrant.  *See Elliott*, 322 F.3d at 714-15.

14

15      C.  *Federal Warrant - Second Warrant*

16      VanDyck asserts this warrant must also be suppressed as fruits of the original

17  unlawful warrant.  As the Court has found the original warrant was appropriately issued,

18  suppression of the second warrant is not appropriate.

19

20  III.  *VanDyck's Motion to Suppress Due to Illegal Grand Jury Subpoena* (Doc. 88)

21      A.  *Privacy Interest*

22      VanDyck argues that New Jersey recognizes a privacy interest in IP addresses and its

23  courts have determined that an IP address obtained by a grand jury subpoena must be

24  suppressed.  *State v. Reid*, 194 N.J. 386, 945 A.2d 26 (2008).  However, federal courts have

25  consistently determined that "no reasonable expectation of privacy exists in an IP address,

26  because that information is also conveyed to and, indeed, from third parties, including ISPs.

27  'IP addresses are not merely passively conveyed through third party equipment, but rather

28  are voluntarily turned over in order to direct the third party's servers.'"   *United States v.*

1   *Christie*, 624 F.3d 558, 574 (3d Cir. 2010) (citing *United States v. Forrester*, 512 F.3d 500,

2   510 (9th Cir. 2008); *cf. Smith v. Maryland*, 442 U.S. 735, 743 (1979)). The *Christie* court

3   noted, "The one case upon which Christie relies, *State v. Reid*, dealt specifically with the

4   New Jersey constitution, not the federal constitution, and is thus inapposite here." 624 F.3d

5   at 574, n. 4.

6        Moreover, VanDyck is not accurately describing *Reid*. The *Reid* court determined

7   that the use of a defective municipal subpoena to obtain an IP address was unconstitutional

8   under New Jersey law. "Instead, the court stated that law enforcement officials could satisfy

9   the protection of the right to privacy in [that] instance by serving a grand jury subpoena on

10  an ISP without notice to the subscriber." *State v. Leblanc*, 137 So. 3d 656, 661 (La.App.

11  2014). As another court summarized: "[D]espite the privacy retained in internet user

12  identification, the *Reid* court opined that such information was still obtainable by police

13  through properly issued subpoenas, rather than warrants based on probable cause." *State v.*

14  *Simmons*, 190 Vt. 141, 148 n. 5, 27 A.3d 1065, 1070 n. 5 (2011).

15       VanDyck's reliance on *Reid* is misplaced not only because there is no federally

16  recognized reasonable expectation of privacy in subscriber information provided to internet

17  service providers, but because *Reid* itself recognized the use of a grand jury subpoena

18  without notice to a subscriber would satisfy the protection of the right to privacy.

19

20       **B.** *Grand Jury Subpoena*

21       VanDyck argues that the grand jury subpoena used in this case violated Arizona law.

22  In essence, VanDyck complains that the grand jury subpoena was created by the detective

23  and prosecutor, rather than the grand jury, and the state grand jury procedures were not

24  complied with. Even if there has been a violation, VanDyck has not pointed to any federal

25  authority determining that the appropriate remedy is the exclusion of evidence rather than

26  civil litigation. Although VanDyck points to a 1982 case in which a warrant was quashed,

27  it did not address the exclusion of evidence. *Gershon v. Broomfield*, 131 Ariz. 507 (1982).

28  VanDyck also cites to *State v. Doolittle*, 155 Ariz. 352, 746 P.2d 924 (App. 1987), for the

assertion that "Arizona law requires the suppression of evidence unlawfully compelled by grand jury process."  That case, however, dealt with testimony before the grand jury, not the issuance of a grand jury subpoena.  Moreover, although the government has conceded there were irregularities in the issuance of the state grand jury subpoena, the remedy belonged to Comcast to seek to quash the subpoena – not to a person without a privacy interest in the IP address.

Additionally, a violation of state law does not affect federal protections.  Rather, "[t]he general rule . . . is that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law." *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000); *United States v. Miranda-Guerena*, 445 F.3d 1233, 1238 (9th Cir. 2006).[2]

VanDyck also argues 18 U.S.C. § 2703 has been violated.  Even if VanDyck is correct, the Ninth Circuit has found that a statutory violation warrants civil damages, not an exclusion remedy.  *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998).

Lastly, VanDyck discusses "threatening" language included in the grand jury subpoena and discussions made during the state grand jury proceeding.  The Court does not find any basis to conclude that standard language on a subpoena warrants exclusion.  Further, the state grand jury ultimately indicted VanDyck - VanDyck's complaint does not affect that probable cause finding or the issuance of the grand jury subpoena.

The Court finds any alleged irregularities or misconduct related to the issuance of  of the grand jury subpoena to Comcast does not warrant suppression.

Accordingly, IT IS ORDERED:

1.      The Motion to Suppress Due to Illegal Search Warrant Unsupported by Probable Cause (Doc. 87) is DENIED.

---

[2]The exceptions to the general rule, the determinations of the legality of an inventory search or a search incident to arrest, *Cormier*, 220 F.3d at 1111, are not applicable here.

1       2.       The Motion to Suppress Due to Illegal Grand Jury Subpoena (Doc. 88) is

2              DENIED.

3   DATED this 19th day of May, 2016.

4

5

6                                     Cindy K. Jorgenson

7                                     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28