JOHN S. LEONARDO
United States Attorney
District of Arizona
CARMEN F. CORBIN
Assistant U.S. Attorney
State Bar No. 025422
ERICA L. SEGER
Assistant U.S. Attorney
State Bar No. 022681
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
Email: carmen.corbin@usdoj.gov
        erica.seger@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Ryan Galal VanDyck,<br><br>                    Defendant. | CR 15-00742-TUC-CKJ (BPV)<br><br>TRIAL BRIEF |

I.      **CHARGES AGAINST THE DEFENDANT**

        Defendant is charged by indictment with one count of conspiracy to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

II.     **STIPULATIONS**

        The parties have entered into stipulations which have been filed with this Court. The stipulations establish the following:

        A.      **Stipulations of Fact (ECF Doc. 124.)**

        1.      In May 2014, the Tucson Police Department ("TPD") Internet Crimes Against Children Unit received information from the National Center for Missing and

Exploited Children ("NCMEC") that indicated that on March 30, 2014, at 7:43UTC, an image of child pornography was sent via email address doudykid@aim.com, using the IP address 69.244.63.8. The IP address belonged to Comcast Communications and was being used by a subscriber in Tucson, Arizona.

2. On May 28, 2014, a state grand jury subpoena requesting the subscriber information for the individual assigned the IP address 69.244.63.8 on March 30, 2014 at 7:43UTC, was served upon Comcast Communications. On May 29, 2014, Comcast Communications responded to the subpoena, indicating that the user of the IP at the designated time was Premier Landscaping Service, 3008 W. Sun Ranch Trail, Tucson, AZ 85742.

3. Ryan VanDyck is a co-owner of the business, Premier Landscaping Service, and resided at the address 3008 W. Sun Ranch Trail, Tucson, AZ 85742.

4. TPD Detective Daniel Barry obtained and served a search warrant upon VanDyck's residence, 3008 W. Sun Ranch Trail, Tucson, AZ 85742, on September 9, 2014. During the execution of the search warrant on September 9, 2014, VanDyck was interviewed and admitted to possessing and distributing child pornography over a period of several years. VanDyck also stated he is physically attracted to prepubescent children or children in their 'pre-teen' years.

5. The electronic devices and computers that were located in VanDyck's home during the execution of the search warrant on September 9, 2014, were reviewed. Hundreds of images and videos depicting prepubescent children engaged in sexual acts and exploitive exhibition were found on the devices and computers. Other photographs and videos of children were found on VanDyck's computer that looked as though they were taken surreptitiously.

6. VanDyck and co-defendant, Jannea Knight, met in March 2014 while traveling on a cruise ship. Knight resided in Idaho.

7.     From March 2014 to April 10, 2015, VanDyck and Knight communicated by text messages and emails, and became involved in a sexual relationship.  Knight's phone number was 208-891-3914.  Knight's email address was Janneak@yahoo.com, and VanDyck's email address was rvandyck@gmx.com.

8.     In June 2014, VanDyck travelled to Idaho to visit Knight. VanDyck brought an external hard drive with him that contained child pornography. VanDyck showed the child pornography images and videos to Knight while he was in Idaho. The images and videos included boys and girls around the ages of 11 and 12 having sex with other children.

9.     In July 2014, Knight sent VanDyck an email with the subject line "Ur girl's videos".  Attached to the email were three videos of the female child victim, N.C. In the videos, N.C. is dancing and playing with another child.  Knight also sent VanDyck an email with the subject line "Other vid's of ur girl." Attached to the email were two videos of N.C. doing gymnastics moves. At the time these emails were exchanged, VanDyck was in Arizona and Knight was in Idaho.  Both parties agree that copies of these emails and attachments should be admitted into evidence and are submitted to the court as Exhibits 6 and 7.

10.     In August 2014, VanDyck traveled to Idaho to visit Knight, and met the child victim, N.C. At the time, N.C. was 11 years old.  N.C. was the daughter of Knight's roommate, Debbie O'Brien.  Both parties agree that a certified copy of N.C.'s birth certificate should be admitted into evidence and is submitted to the court as Exhibit 5.

11.     VanDyck told Knight that he thought N.C. was "cute" and that he was "into her."  VanDyck requested that Knight pretend to be N.C. when they were having sexual intercourse.

12.     VanDyck knew that N.C. was under the age of 15.

13.     While in Idaho in August 2014, VanDyck and Knight agreed to surreptitiously record N.C. while she was changing her clothes.  VanDyck specifically told Knight that he wanted to record a video of N.C. undressing, and that he wanted to

see the child's body in the video.  They agreed to use the cameras on their phones to surreptitiously record N.C. undressing.

14.     On August 4, 2014, VanDyck placed his iPhone 5 cellular phone, which had a camera, in the closet of a bedroom in Knight's apartment in Idaho in order to capture a video of N.C. undressing.

15.     On August 4, 2014, VanDyck recorded a video entitled "IMG_0310.MOV" on his iPhone 5 phone that depicted N.C. undressing.  Knight was also depicted in the video.  This is Exhibit 1, and the transcript of "IMG_0310.MOV" is Exhibit 8.

16.     On August 4, 2014, VanDyck placed his iPhone 5 cellular phone, which had a camera, on the window sill of the same bedroom in Knight's apartment in Idaho in order to capture a video of N.C. undressing.

17.     On August 4, 2014, VanDyck recorded a video entitled "IMG_0331.MOV" on his iPhone 5 phone that depicted N.C. undressing.  Knight was also depicted in the video. This is Exhibit 2, and the transcript of "IMG_0331.MOV" is Exhibit 9.

18.     After the videos were made in Idaho where N.C. and Knight lived, VanDyck travelled back to Arizona and downloaded them onto his computer in Tucson, Arizona.

19.     In September 2014, after the videos were discovered by law enforcement, VanDyck communicated with Knight via text messages, and directed her to tell N.C.'s mom that the videos were a "mistake."  On September 28, 2014, VanDyck and Knight exchanged the following text messages:

VanDyck:     Did you tell her about the video?

Knight:     Debbie would like to be able to talk to you about this.

VanDyck:     We are going to have to tell her that we captured it by mistake. That's the only reason this detective is trying to get in touch with Naveah.

Knight:     Yeah she knows.

VanDyck:     Is she understanding that we didnt intend to capture that?

- 4 -

| | | |
|---|---|---|
| 1 | Knight: | She does now. |
| 2 | | . . . |
| 3 | VanDyck: | Debbie has our back? |
| 4 | Knight: | Yes she does. |
| 5 | VanDyck: | I think we will get understanding. Simple unintended. They both |
| 6 | | should know you and I are not like that. Tell them Im sorry they |
| 7 | | were drug into this for stuff that hasnt been in my life for a decade. |
| 8 | | And the police are using whatever crutch they have to disturb more |
| 9 | | people. This whole thing has been handled inappropriately. They |
| 10 | | understand it was a mistake? |
| 11 | Knight: | They dont naveah to go through any more. |
| 12 | VanDyck: | So, she is going to tell the detective they are not interested in |
| 13 | | pursuing anything with it, and to leave them alone? |
| 14 | Knight: | Yes I believe so. |
| 15 | VanDyck: | It is really important that she uses specific words, I am not interested |
| 16 | | in Ryans case, he has never hurt my daughters, and if the detective |
| 17 | | mentions the video, state, I already know it was a mistake, they were |
| 18 | | forthcoming, stating they would try to find a way to securely delete |
| 19 | | it, and it was not intended the conversation has to be quick, because |
| 20 | | the detective will try to turn things around, and will lie to get what |
| 21 | | he wants. The tech detective will lie, he's been lying about all sorts |
| 22 | | of things Also, he will record the phone call. |

At the time that these communications were exchanged, VanDyck was in Arizona and Knight was in Idaho.

20.    In November 2014, VanDyck and Knight exchanged text messages regarding VanDyck committing sex acts on a minor female. On November 4, 2014,

VanDyck exchanges text messages with Knight and describes having sexual intercourse with the minor female.

      21.    On March 18, 2015, VanDyck and Knight exchanged the following text messages:

| | |
|---|---|
| VanDyck: | Did you ever see neveah naked? |
| Knight: | Yes but only in the dark |
| VanDyck: | You saw it? |
| Knight: | She was budding and was very cute. |
| VanDyck: | I know. I saw her tits. Talking about her pussy |
| Knight: | Oh she had a very nice one |
| | I saw a little bit when she put on her swimsuit |
| | It was very nice |
| VanDyck: | Did you see her clit? |
| Knight: | Not very clearly |
| VanDyck: | Did she have hair? |
| Knight: | I saw it |
| VanDyck: | Hmm. I wanted to see her so bad |
| Knight: | No hair yet |
| VanDyck: | You must have seen quite a bit of her to see her clit |
| Knight: | She sat down. |
| | I saw a lil through her swimsuit. That's all. Never direct |

      22.    Both parties agree that copies of the text messages exchanged between Knight and VanDyck should be admitted into evidence and are submitted to the court as Exhibit 4.

      23.    On April 10, 2015, VanDyck possessed an HP laptop computer, model DV7T-6B00, s/n 2CE1481G8R, with an internet connection.  Stored on the computer was a video entitled "Lolitashouse – Luba Shasha Vika.avi."  This video depicts minor

children, under the age of 12, engaged in sexually explicit conduct.  VanDyck downloaded the video from the internet.

24. On the hard drive of the defendant's laptop computer described above, were the following videos, copies of which both parties agree should be admitted into evidence, and are submitted to the court as exhibits 1 through 3 hereto:

Ex. 1     IMG_0310.MOV

Ex. 2     IMG_0331.MOV

Ex. 3     Lolitashouse – Luba Shasha Vika.avi

25. Exhibits 1 and 2 depict an actual child who was under the age of 12 at the time the videos were created.  Exhibit 3 depicts actual children who were under the age of 15 at the time the video was created.

26. Exhibits 1 through 3 are visual depictions which were mailed, shipped and transported in interstate or foreign commerce, and were produced using materials which had traveled in, been mailed, shipped and transported in interstate or foreign commerce.

27. On April 10, 2015, the defendant knew Exhibits 1 through 3 were on his computer, and knew the content of these exhibits.

28. The hard drive in defendant's HP laptop computer and the defendant's iPhone 5 cellular phone were manufactured outside the state of Arizona.

**B.     Stipulation of Expected Testimony – Jannea Knight (ECF Doc. 123.)**

The parties stipulate and agree that should Jannea Knight be called to testify, she would testify as follows:

1. I met Ryan Galal VanDyck on a cruise in March 2014.  At the time, I was living in Boise, Idaho and VanDyck told me he lived in Tucson, Arizona.  After the cruise, I continued to communicate with VanDyck and we would travel to see each other.

2. I first learned that VanDyck was sexually interested in children in June 2014 when he showed me videos of child pornography.  He brought these videos with him from Arizona to Idaho on an external hard drive.  The images and videos included boys and girls around the ages of 11 and 12 having sex with other children.

3.      VanDyck then asked me to role play during sex and pretend to be a 10 to 13 year old female child.  He told me that under 10 was too young and over 13 was too old.  After this time, almost every time we would have sex, he would ask that I pretend to be a child.  Usually, he would provide me with two options of children we had seen during the day and ask me to choose which one I preferred.  On occasion, VanDyck would pretend to be a male child, but usually I would role play as the female child.

4.      When VanDyck came to visit me in Boise, he would stay in my apartment.  One of my roommates was Debbie O'Brien, the mother of N. C..  N. C. was 11 years old.

5.      Once VanDyck learned about my roommate's children, on one occasion VanDyck asked me to pretend to be N. C. when we were having sex.  I role-played N. C. as having daddy issues.  Once VanDyck met N. C., he told me that my role play was not accurate as N. C. already had a father figure.

6.      In July 2014, I sent VanDyck at least two emails with videos and pictures of N.C. attached.  I sent these emails because VanDyck indicated he wanted to see N. C..

7.      In August 2014, VanDyck flew to Boise to visit me.  N. C. was visiting her mother during the same timeframe.  VanDyck told me that he thought N. C. was cute and that he was into her.  Although I did not think it at the time, I now think that VanDyck timed his visit when he knew N. C. would be visiting her mother.  While VanDyck was in Idaho, we took N. C. in a boat.  While we were in the boat, N.C. got wet and when we returned to my apartment, VanDyck picked out clothes to give N. C. to change into while her clothes were drying.  While he was picking out the clothes, he asked me to take a video of N. C. changing clothes.  VanDyck told me that he wanted to see N. C.'s body in the video, including her butt and pubic area.  I agreed to record N. C. changing clothes without her knowing.  Although I pushed the record button on my phone, the video did not record.  I did not know that VanDyck had set up his phone in my closet to also record a video.

8.      After I failed at trying to record the video, VanDyck asked me to try again when N. C. was changing back into her clothes.  VanDyck set up his camera on the

window sill of the bedroom to record a video of N. C. changing her clothes.  He took his phone containing the videos back to Arizona with him.

9.      In September 2014, after police found one of the above videos, VanDyck told me to tell Debbie, N. C.'s mom, that the videos were a mistake.  VanDyck and I communicated via text message about having Debbie tell the police that she did not want to pursue charges.  The police have a copy of those texts as they were on my phone when the police took it.

10.      In October 2014, I traveled to Arizona to see VanDyck and we went to Tombstone/Bisbee.  While we were on this trip, VanDyck would follow children around and take pictures.  We followed one of the children, a boy, to the library where I played Duck Hunter with him.  Later that night, VanDyck pretended to be the boy during intercourse.

11.      In March 2015, I exchanged text messages with VanDyck regarding N.C.. VanDyck asked me if I had seen N.C.'s genitals.  After I responded that I had, VanDyck stated that he "wanted to see her so bad."  The police have a copy of those texts as they were on my phone when the police took it.

12.      VanDyck would also text me about having sex and engaging in other sexual acts with various minor children.  These children included Shylow, Destiny and Amanda. The police have a copy of those texts as they were on my phone when the police took it.

13.      I am a co-defendant in the present matter and was charged with Conspiracy to Produce Child Pornography. The minimum sentence following a conviction for this charge is 15 years. I was ultimately offered a plea agreement from the government for the crime of Stalking. This charge does not have a minimum mandatory sentence of imprisonment and the maximum punishment is 5 years.

14.      I sent sexually explicit images of myself to what I thought was 11 year old boy named Shylow.  I received child pornography from Shylow in exchange and also discussed having sexual intercourse with Shylow through text messages.  I later learned that Shylow was not real and was a fictional child created by VanDyck.

15.     When I was originally interviewed by police, I was concerned that I was going to be thrown in jail. I was told by police that I was not going to jail and they were more interested in VanDyck. I also told police I was concerned that I would lose my job if this went bad. I was then encouraged by police to be honest.

16.     During my interview, I originally denied that VanDyck mentioned recording any video and stated I did not remember recording anything. I also told police during my interview that VanDyck did not tell me why he wanted a video of N.C. After I was encouraged to be honest, I provided the information contained in paragraphs 1-12.

## III.     STATEMENT OF FACTS

In May 2014, the Tucson Police Department ("TPD") Internet Crimes Against Children Unit opened an investigation on Ryan Galal VanDyck, a resident of Tucson, Arizona. The investigation was opened due to a tip that the Arizona Internet Crimes Against Children Task Force received from the National Center for Missing and Exploited Children ("NCMEC"). The tip indicated that on March 30, 2014, an image of child pornography was sent via the America Online email address doudykid@aim.com, using the IP address 62.244.63.8. NCMEC noted that the IP address belonged to Comcast Communications and was being used in Tucson, Arizona. As the IP address was located in Tucson, TPD opened the investigation.

Upon receiving the tip, TPD Detective Daniel Barry reviewed the suspect email and the attached photograph. After determining that the photo was child pornography, Detective Barry requested that a Pima County Grand Jury subpoena be issued to Comcast Communications to obtain the subscriber information for the user of IP address 69.244.63.8 from March 30, 2014 at 7:43UTC. The subpoena was signed by the Pima County Deputy Attorney Supervisor and recorded with the Pima County Superior Court. The subpoena was then served upon Comcast Communications by fax.

On May 29, 2014, Comcast Communications responded to the subpoena, indicating that the user of the IP at the designated time was Premier Landscaping Service, 3008 W. Sun Ranch Trail, Tucson, AZ 85742. Further investigation revealed that Ryan

VanDyck was the primary resident at this address.

A search warrant was obtained and served upon VanDyck's residence on September 9, 2014.  During the execution of the search warrant on September 9, 2014, the defendant was interviewed and admitted to possessing and distributing child pornography over a period of several years.  He also admitted to being physically attracted to prepubescent children or children in their 'pre-teen' years.  During a forensic preview of electronic devices located in VanDyck's home, hundreds of images and videos depicting prepubescent children engaged in sexual acts and exploitive exhibition were located.

During the analysis of the defendant's Hitachi external hard drive, a video was discovered that depicted the defendant setting up a camera in a bedroom of a home.  A young girl ("child victim") is seen entering the room with co-defendant, Jannae Knight. Knight gives the child victim clothes and the child victim begins removing the clothes she is wearing.  As she changes, Knight is seen trying to convince the child victim's younger sister to leave the room.  After the child victim changes clothes, she leaves the room.   Knight and VanDyck are seen coming back into the room, and Knight tells VanDyck, "I totally sucked at that."  She explains that she could not get the video with her phone but had the child standing in front of the camera as she got changed.  VanDyck is seen obtaining the camera and the video ends.  Data from the video shows it was produced on August 4, 2014 at 6:20PM.

Knight was located and interviewed on April 8, 2015.  Knight admitted to having met VanDyck on a Carnival Cruise in March 2014.   She also indicated that she was aware of VanDyck's proclivity towards children, which he introduced to her on his second visit to see her in Boise, ID by showing her child pornography.  Knight admitted that the making of the video involving the child victim was intentional, and that VanDyck asked Knight to record the child changing clothes on her cell phone, as well as on his cell phone.  Knight admitted that she and VanDyck also recorded a second video involving

the child victim.  Knight indicated that VanDyck set-up the camera in a window in the same room and that she was present when the video was recorded.

As a result, on April 10, 2015, a federal search warrant was obtained for the defendant's residence.  The defendant's computer contained the second video as well as child pornography.  On April 15, 2015, both Ryan VanDyck and Knight were indicted on child exploitation offenses.  (ECF Doc. 12.)

## IV.   ELEMENTS OF THE OFFENSES

### A.   Conspiracy to Produce Child Pornography - 18 U.S.C. § 2251(a) and (e)

Count one of the indictment charges the defendant with conspiracy to produce of child pornography, in violation of 18 U.S.C. § 2251(a) and (e).  To establish that offense, the government must prove the following elements beyond a reasonable doubt: (1) The defendant agreed with at least one other person to commit the crime of Production of Child Pornography; (2) the defendant became a member of the conspiracy knowing that its object was the Production of Child Pornography, in violation of Title 18 U.S.C. § 2251(a) and (e), and intending to accomplish said object; (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy; (4) at the time of the offense, the victim was under the age of eighteen; (5) defendant employed, used, persuaded, induced, or enticed her to engage in sexually explicit conduct as defined in 18 U.S.C. § 2256(2) for the purpose of producing a visual depiction of such conduct; and (6) the visual depiction was produced or transmitted using materials that were mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or was actually transported or transmitted using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce.  18 U.S.C. § 2251(a); Model Jury Instructions for the Ninth Circuit, § 8.20 (2015) and § 8.181 (2014).

#### 1.   Conspiracy

Courts have long held that the "gist of the crime of conspiracy . . . is the agreement

or confederation of the conspirators to commit one or more unlawful acts." *Braverman v. United States*, 317 U.S. 49, 53 (1942).   Every conspiracy, therefore, has at least two elements: (1) an agreement (2) between two or more persons. Members of the conspiracy are also liable for the foreseeable crimes of their fellows committed in furtherance of the common plot. Moreover, statements by one conspirator are admissible evidence against all. Conspiracies are considered continuing offenses for purposes of the statute of limitations and venue.   Courts may "take[] a bilateral approach to the crime of conspiracy: at least two people must agree." *United States v. Gonzalez*, 2015 WL 2215956 (9th Cir. May 13, 2015). Consequently, there should be proof that other participants in the conspiracy had the requisite intent. *Id*. The testimony of coconspirators alone is sufficient to support a conviction for conspiracy unless it is incredible or insubstantial on its face. *United States v. Benedict*, 815 F.3d 377 (8th Cir. 2016.)   A conspiracy under 18 U.S.C. § 2251(e) does not require an overt act. *See Whitfield v. United States*, 543 U.S. 209, 213-14 (2005) (when Congress omits an explicit reference to an overt act in a conspiracy statute, it dispenses with that requirement).

The conspiracy between the defendant and Knight began in June 2014, involved filming the minor child, continued through their text messages in September 2014, when they discussed what to tell N.C.'s mother and law enforcement about the videos of N.C., and in March 2015 when VanDyck states that he wanted to see N.C.'s genitalia.

### 2.      Production of Child Pornography

The term "sexually explicit conduct" means actual or simulated sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal), bestiality, masturbation, sadistic or masochistic abuse, and the lascivious exhibition of the genitals or pubic area of any person.   18 U.S.C. § 2256(2).   In determining what constitutes a "lascivious exhibition," courts generally look to six factors:

1)      whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*United States v. Overton,* 573 F.3d 679, 686 (9th Cir. 2009); *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Weigand*, 812 F.2d 1239 (9th Cir. 1987).  The factors "are neither exclusive nor conclusive, but operate as merely 'a starting point' for determining whether a particular image is 'so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.'"  *Overton*, 573 F.3d at 686 (citation omitted).  The fact-finder should not be made to rely on the so-called *Dost* factors "with precision to reach a mathematical result, or to weigh or count them, or to rely on them exclusively."  *Id.* at 686-87 (internal quotation marks and citation omitted).  *Dost* itself recognizes that a visual depiction "need not involve all of these factors to be a 'lascivious exhibition of the genitals or pubic area.'"  636 F. Supp. at 832.  Rather, the determination is made "based on the overall content of the visual depiction, taking into account the age of the minor."  *Id.*[1]

Courts have found surreptitiously recorded videos to constitute child pornography.  In *United States v. Johnson*, 639 F.3d 433 (8th Cir. 2011), the Eighth Circuit reinstated a jury verdict finding a weightlifting coach guilty of attempted production of child

---

[1] The term "visual depiction" includes "undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."  18 U.S.C. § 2256(5).  It expressly includes such things as graphic image files stored on a computer disk or electronic storage medium.  *United States v. Hockings*, 129 F.3d 1069, 1071-72 (9th Cir. 1997).

- 14 -

pornography. Over an 18-month period, Coach Johnson secretly videotaped two minor girls stripping naked and weighing themselves in an examination room at the sports medicine clinic that employed him. Johnson adjusted the level of the zoom feature on the camera and the position of the scale from video to video. Some of the clips show the girls' pubic areas (but not genitals) as they stand on the scale and move around the room.

Although it was reviewing the sufficiency of the evidence to support an attempted production of child pornography conviction, the court nonetheless analyzed the defendant's attempt in the context of the *Dost* factors. The court concluded that a "reasonable jury could draw a reasonable inference that Johnson intended the videos to be sexual in nature and to elicit a sexual response in the viewer," notwithstanding the lack of any overt sexual activity by the victims. *Id.* at 441. The court noted that, in some of the videos, Johnson used the zoom feature to record close up shots "on the area the where the females' genitals would be if they were to face the camera." *Id.* at 440. One of the videos "captured a close up of the minor's left buttock, and it would clearly have met the first *Dost* factor if the minor would have merely turned around." *Id.* Likewise, the fourth *Dost* factor was met because the females strip down to complete nudity before the camera. Similarly, videos' capture of the girls from their shoulders to their calves supported the inference that Johnson "attempted to obtain images portraying them as sexual objects and that their facial features were apparently of little or no importance." *Id*. As to the final *Dost* factor, the court concluded that Johnson's (1) surreptitious recording of girls disrobing and (2) statements that he recorded the girls because he was curious as to what they would look like nude and because his "pervertedness got the best of [him]"suggested that he intended the videos to elicit a sexual response in the viewer. *Id.* Accordingly, the Government offered sufficient evidence for a jury to find that the defendant attempted to use the minors to engage in sexually explicit conduct for the purpose of producing a visual depiction of such. *Id.* at 441. The court also commented, "A reasonable jury could conclude that these videos of teenage minor females disrobing and weighing themselves in the nude cannot reasonably be compared to innocent family photos, clinical depictions,

or works of art." *Id.* at 439.

In *United States v. Clark*, No. 09-33, 2010 WL 3488138 (D. Del. Aug. 30, 2010), a jury convicted Clark of nine counts of attempted production/production of child pornography, based on his surreptitious recording of a minor victim undressing in a bathroom on eight occasions, and showering on a ninth occasion. These videos contain numerous, albeit fleeting, instances in which the victim's pubic area is captured at distances ranging from inches to a few feet from the camera at different angles as she moves around the bathroom. Rarely is her head or face visible, because the camera was hidden around waist-height. In denying Clark's post-trial motion for acquittal, the district court held that the jury could have reasonably concluded that the recorded images constituted the "lascivious exhibition of the genitals or pubic area," thus finding Clark guilty of production of child pornography on eight counts. *Id.* at *7. On the ninth count, the court relied on the same evidence to find that the jury reasonably convicted Clark of attempted production of child pornography. *Id.* at *7, n 5.

The *Clark* court employed the *Dost* factors in concluding that the videos depicted the "lascivious exhibition of the genitals or pubic area." First, the court found that the focal point of each of the eight undressing videos was the girl's pubic area and buttocks. *Id.* at *5. Second, the court noted that a bathroom is the place in a house where a person is most likely to expose her genitals or pubic area. As to the third and fourth *Dost* factors, each of the first eight videos surreptitiously records the girl's mid-section as she disrobes to the point of full nudity. Although the girl's pose is not "unnatural," the surreptitious, close-up recording of the naked girl "weighed in favor of lasciviousness." *Id.* at *6. The fifth factor simply did not apply in a hidden camera case, because the child does not know that she is being filmed.

Finally, the jury could have concluded that the depictions were intended or designed to elicit a sexual response in the viewer, "as [each] was planned for an audience consisting of Clark and likeminded individuals." *Id.* at *6 (citing *Knox*, 32 F.3d at 747 ("'applied to the conduct of children, lasciviousness is not a characteristic of the child

photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles.'" (quoting *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987))); *see also United States v. Banks*, 2009 WL 455491, at *10 (9th Cir. Feb. 25, 2009) ("This focus results in a definition of lasciviousness that criminalizes images 'so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.'").

The Tenth Circuit also employed the *Dost* factors to affirm a Section 2251(a) conviction based on surreptitious bathroom videotaping of a minor in *United States v. Helton*, 302 Fed. Appx. 842 (10th Cir. 2008). There, the defendant hid a camcorder at foot-level in his bathroom, focusing the lens on the toilet. The camera recorded a minor female sitting on the toilet for several minutes, then standing and pulling up her underwear, the image of which appears in the center of the focused area. Helton also possessed an additional 247 items revealing his "preoccupation with images of women and girls in their underwear." *Id.* at 845. On appeal, Helton argued that that the charged video did not depict the "lascivious exhibition of the genitals" and therefore could not support his conviction for production of child pornography. In affirming the conviction, the court first held that Section 2251 "does not specify the genitals or pubic area must be fully or partially uncovered in order to constitute an exhibition and, like our sister circuits, we decline to read such a requirement into the statute." *Id.* at 846- 47. The court noted the presence of the first *Dost* factor, because the video focused on the minor's pubic area and genitals, and approvingly cited the district court's decision to give the second factor "some weight," because the staging and surreptitious nature of the video made it sexually suggestive. *Id.* at 848. The third, fourth and fifth *Dost* factors were not present, due to the surreptitious nature of the recording. Finally, the court concluded that the video was "intended to elicit a sexual response in the viewer," which the court "defined as [defendant] and likeminded individuals." *Id.* at 848. The court emphasized the district court's conclusion that Helton "had an 'extreme interest in visual depictions of female underpants'" as strong evidence of his lascivious intent. *Id.* at 849.

Section 2251 prohibits "the inducement of children into sexual conduct for the purpose of creating visual depictions of that conduct." *United States v. Smith*, 795 F.2d 841, 845 (9th Cir. 1986). Section 2251 does not require "that the defendant's ultimate goal be distribution of the visual depiction." *Id; See also United States v. McCalla*, 545 F.3d 750, 755 (9th Cir. 2009) (§ 2251(a) "criminalizes the production of 'homegrown' child pornography"); *United States v. Griffith*, 284 F.3d 338, 347 (2d Cir. 2002) ("§ 2251(a) does not require that a defendant produce the sexually explicit depiction for commercial gain"). Nor is a completed visual depiction even required; § 2251 "does not require the actual production of a visual depiction, merely the enticement of minors *'for the purpose of producing'* a visual depiction of sexually explicit conduct." *Smith*, 795 F.2d at 846 (emphasis in original).

Interstate nexus under § 2251(a) can be proved in any of three ways: by proof that the defendant "knows or has reason to know" that the visual depiction "will be transported or transmitted using any means or facility of interstate or foreign commerce"; by proof that the visual depiction "was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer"; or by proof that the visual depiction "has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce." *United States v. Sheldon*, 730 F.3d 1128, 1131 (9th Cir. 2013).

In this case, the government can establish interstate nexus either by proof that the visual depictions were produced or transmitted using materials that had been shipped or transported in or affecting interstate or foreign commerce, or that the visual depictions were actually transmitted or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce. For example, the stipulation between the parties state that the defendant's iPhone 5 was used to take the videos of the child victim, or that the videos were stored and maintained on the HP laptop computer, will suffice to prove this element of the offense. (*See* Stipulations of Fact,

paragraph 24); *Id.* at 1132 (to satisfy the jurisdictional element of § 2251(a), the government was only required to prove "that the child pornography was produced with materials that had traveled in interstate commerce"); *United States v. Guagliardo*, 278 F.3d 868, 871 (9th Cir. 2002) (evidence that the defendant copied images of child pornography "onto computer disks that had been manufactured abroad" was sufficient to prove that the images were produced using materials that had been shipped or transported in interstate commerce).  The government need not establish defendant's knowledge "of the interstate nature of the materials used to produce the sexually explicit images." *Sheldon*, 730 F.3d at 1131.

Likewise sufficient to prove the jurisdictional element and proper venue[2] is the proof that the images themselves in fact traveled in interstate commerce.  Here, VanDyck brought the videos of the child victim into Arizona from Idaho, and downloaded the child pornography video from the internet.

### B.      Possession of Child Pornography - 18 U.S.C. § 2252A(a)(5)(B)

Count two of the indictment charges defendant with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Section 2252A(a)(5)(B) makes it an offense to knowingly possess any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, shipped, or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, shipped, or

---

[2] As the court noted in *United States v. Sullivan,* "[u]nder 18 U.S.C. § 3237(a), offenses begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  797 F.3d 623, 631 (9th Cir. 2015) (internal quotation marks omitted).  "Venue is proper under § 3237 when an 'essential conduct element' of the offense continues into the charging district." *Id.* (quoting *Rodriguez-Moreno*, 526 U.S. at 280–82). "It is by now well settled that venue on a conspiracy charge is proper where ... any overt act committed in furtherance of the conspiracy occurred." *United States v. Gonzalez*, 683 F.3d 1221, 1224 (9th Cir. 2012). *See also United States v. Hui Hsiung,*  2014 WL 3361084 (9th Cir. Jul. 10, 2014);

transported in or affecting interstate or foreign commerce by any means, including by computer.  Thus, to sustain a conviction under § 2252A(a)(5)(B), the government must prove the following beyond a reasonable doubt:

1.     Defendant knowingly possessed material that contained an image of child pornography, that is, a visual depiction of a minor engaged in sexually explicit conduct;

2.     He knew the visual depiction(s) showed a minor engaged in sexually explicit conduct; and

3.     The visual depiction(s) had either been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or were produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.  Model Jury Instructions for the Ninth Circuit, § 8.185 (2015) (modified for 18 U.S.C. § 2252A(a)(5)(B)).

To establish possession, the government must prove "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it]."  *United States v. Romm,* 455 F.3d 990, 999 (9th Cir. 2006) (bracketed material in original; internal quotation marks and citations omitted).  To establish knowledge, the government must prove that the defendant knew the material he possessed "contained an unlawful visual depiction."  *Lacy,* 119 F.3d at 747.

Interstate nexus can be established in different ways.  For example, proof that an image was created in one state but possessed in another is sufficient to establish that it has been shipped or transported in or affecting interstate commerce.  *United States v. Lynn*, 636 F.3d 1127, 1135 (9th Cir. 2011).  It is sufficient to show that the image "had previously moved in interstate commerce," even if it did so before being downloaded onto the defendant's computer.  *Id.* at 1135-36.  The government can also establish interstate nexus by showing that the image was downloaded or copied onto a computer disk or other data storage medium that was manufactured outside of the state. *See United*

- 20 -

*States v. Guagliardo*, 278 F.3d 868, 871 (9th Cir. 2002) (images were produced using materials that had been shipped or transported in interstate or foreign commerce when they were copied onto computer disks that were manufactured abroad); *Lacy,* 119 F.3d at 750 (the government established the jurisdictional element where it offered "undisputed evidence" that the computer hard drive, monitor, and disks the defendant used to download the images had traveled in interstate commerce).

Here, the defendant possessed a video depicting actual children engaged in sexually explicit conduct, as defined above.  The stipulations between the parties state that the video was found on the defendant's computer, the defendant knew the video was on the computer, and knew the content of the video.  There is no dispute as to VanDyck's ownership and possession of the computer. (*See* Stipulations of Fact, paragraph 24.)  The hard drive in defendant's computer was manufactured abroad.  Finally, the video depicts children and sexually explicit conduct.

## V.   EVIDENTIARY ISSUES

The government intends to introduce evidence of the defendant's other acts and investigations involving child pornography under Fed. R. Evid. 404(b) and 414.  The facts of the other acts and investigations, and the basis for their admission under Rules 404(b) and 414, were discussed in a notice filed by the government in this matter, and are listed in the stipulation between the parties, which has also been filed in this case.  The evidence is highly probative as to the defendant's sexual interest in children and in N.C., and specifically, to his desire and efforts to produce child pornography of N.C.

### A.   Admission of Evidence Under Federal Rule of Evidence 404(b)

Rule 404(b), which provides that evidence of other crimes, wrongs, or acts "is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible for other purposes, such as proof of identity, preparation, plan, motive, knowledge, intent, or lack of mistake or accident.  Evidence is admissible under Rule 404(b) if "(1) the evidence tends to prove a material point;" (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that

1    defendant committed the other act; and (4) (in certain cases) the act is similar to the

2    offense charged." *United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008) (internal

3    quotation marks and citations omitted).  If the evidence satisfies Rule 404(b), the court

4    must then determine whether its probative value "is substantially outweighed by the

5    prejudicial impact under Rule 403." *Id.*  (internal quotation marks and citation omitted).

6         Rule 404(b) "is a rule of inclusion – not exclusion." *United States v. Curtin*, 489

7    F.3d 935, 944 (9th Cir. 2007) (en banc).  Once it has been established that the evidence

8    offered serves a permissible purpose, "the 'only' conditions justifying the exclusion of

9    the evidence are those described in Rule 403: unfair prejudice, confusion of the issues,

10   misleading the jury, undue delay, waste of time, or needless presentation of cumulative

11   evidence[.]" *Id.* (internal citation omitted).  Because Rule 403, by definition, results in

12   the exclusion of relevant and otherwise admissible evidence, it should be used sparingly.

13   *See United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) ("Relevant evidence

14   may be excluded under FRE 403 only if its probative value is substantially outweighed

15   by one or more of the articulated dangers or considerations;" Rule 403 "favors

16   admissibility"); *United States v. Morris*, 79 F.3d 409, 412 (5th Cir. 1996) ("[b]ecause

17   Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that

18   should be used sparingly").

19        Finally, given the strength of the evidence in this case, the probative value of the

20   evidence is not substantially outweighed by the risk of unfair prejudice to the defendant.

21   *See Hankey*, 203 F.3d at 1172 (virtually all evidence offered at trial is prejudicial, but it is

22   "only unfair prejudice, substantially outweighing probative value, which permits

23   exclusion of relevant matter under Rule 403").  In addition, the evidence is admissible

24   because it is inextricably intertwined with the charged offenses.  When the facts relating

25   to a charged offense are inextricably intertwined with other uncharged acts, the

26   uncharged acts are generally admissible.  *United States v. Daly*, 974 F.2d 1215 (9th Cir.

27   1992).  In *Daly*, the defendant, charged with illegal possession of a firearm, was involved

28   in an 11 hour shootout with the authorities prior to his apprehension.  The defendant

argued on appeal following his conviction that evidence of the shootout should have been excluded at the trial.  The court rejected the argument, stating, "[a] jury is entitled to know the circumstances and background of a criminal charge.  It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances which form the basis of the charge." *Id.* at 1217, citing *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984).  The *Daly* court further noted that evidence regarding the shootout was necessary to put his illegal conduct into context.

In *United States v. Vizcarra Martinez*, 57 F.3d 1506, 1512 (9th Cir. 1995), the Ninth Circuit again clarified that "other act" evidence that is inextricably intertwined with the crime charged need not meet the requirements of Rule 404(b).  "Other act" evidence does not fall under Rule 404(b) where the evidence is necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id*.

### B.    Admission of Evidence Under Federal Rule of Evidence 414

Federal Rule of Evidence 414 governs the admission of evidence of a defendant's prior child molestation offenses in a criminal case alleging an offense of child molestation. Rule 414 states, in pertinent part, as follows:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant. . . .

The admission of evidence pursuant to this rule is intended to be broad. Rule 414, along with Rule 413, were enacted as part of the Violent Crime Control and Law Enforcement Act of 1994.  Pub. L. No. 103-322, 108  Stat. 1796 (1994).  These rules were designed to "supersede in sex offense cases the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a presumption "in favor of admission" of prior sexual offense evidence.  Floor Statement of the Principal House Sponsor, Rep. Susan Molinari, Concerning the Prior Crimes Evidence Rules for Sexual Assault and Child Molestation Cases (Cong. Rec. H8991-92, Aug. 21, 1994), included in Advisory Committee's Note to

Rules 413 and 414; available at 140 Cong. Rec. S12990-01, September 20, 1994; see also 140 Cong. Rec. S12990.  The legislative sponsors of Rules 413 and 414 specified that "[i]n contrast to Rule 404(b)'s general prohibition of evidence of character or propensity," Rules 413 and 414 "authorize admission and consideration of evidence of an uncharged offense for its bearing '*on any matter to which it is relevant.*'  *This includes the defendant's propensity to commit sexual assault or child molestation offenses*, and assessment of the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense. . . ."  (*Id.*) (emphasis added).

The legislative sponsors explained the importance of this evidence in cases where a child is the victim:

> The proposed reform is critical to the protection of the public from rapists and child molesters, and is justified by the distinctive characteristics of the cases it will affect.  In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant – a sexual or sadosexual interest in children– that simply does not exist in ordinary people.  Moreover, such cases require reliance on child victims whose credibility can readily be attacked in the absence of substantial corroboration.  In such cases, there is a compelling public interest in admitting all significant evidence that will illumine the credibility of the charge and any denial by the defense.

(*Id.*)

In adopting these rules, Congress built upon a large body of precedent favoring a permissive approach to similar-crimes evidence in sex offense cases.  Congress recognized and intended that this approach would make the admission of similar crimes evidence in federal sex offense cases the norm, and its exclusion the exception:

> The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule.  The presumption is in favor of admission.  The underlying legislative judgment is that the evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative

1

2

value is normally not outweighed by any risk of prejudice or other adverse effects.

3

4

5

6

7

In line with this judgment, the rules do not impose arbitrary or artificial restrictions on the admissibility of evidence.  Evidence of offenses for which the defendant has not previously been prosecuted or convicted will be admissible, as well as evidence of prior convictions.  No time limit is imposed on the uncharged offenses . . . as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses.

8

9

10

140 Cong. Rec. H8992 (1994) (Statements of Rep. Molinari and Senator Dole) (emphasis added); see also 137 Cong. Rec. S3212, S338-3242 (1991); Karp, 70 Chi. Kent L. Rev. at 19.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Ninth Circuit has repeatedly affirmed that evidence admitted under Rules 413 and 414 may be considered by the jury for any relevant purpose, including proof that a defendant has sexually predatory propensities.  *See United States v. Redlightning*, 624 F.3d 1090, 1119 (9th Cir. 2010) ("Under Rule 413, the Government may admit 'evidence of the defendant's commission of another offense or offenses of sexual assault.' Evidence that tends to show that [defendant] committed another sexual assault . . . was admissible under Rule 413 because it tends to show that [he] had the propensity to commit another sexual assault, namely, the [later] offense."); *see also United States v. LeMay*, 260 F.3d 1018, 1028 (9th Cir. 2001) (upholding admission of evidence of defendant's prior acts of molestation and conviction for child molestation 11 years before the charged conduct because such Rule 414 evidence serves to "corroborate testimony of the victims," and is "exactly the sort of use of prior acts evidence that Congress had in mind when enacting Rule 414." (citing 140 Cong. Rec. H899192 (1994)); *United States v. Sioux*, 362 F.3d 1241, 1244 (9th Cir. 2004) (recognizing that these rules supersede the general bar of Rule 404(b) against the admission of propensity evidence, noting that the rules "establish[ ] a presumption, but not a 'blank check,' favoring the admission of propensity evidence at both civil and criminal trials involving charges of sexual misconduct," and finding in a child molestation case that district court properly admitted

evidence of defendant's prior sexual assault of a child); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000) ("Rules 413, 414, and 415 are based on the proposition 'that a defendant with a propensity to commit acts [of sexual assault and child molestation] similar to those charged is more likely to have committed the charged act than another and therefore such evidence is relevant.'").

Every circuit to have considered the issue has also upheld the admission of evidence under Rules 413 and 414, for all purposes, including for propensity. *See, e.g., United States v. Lewis*, No. 07-31432, 2009 WL 377302 (D.C. Cir. Jan. 23, 2009) (admission of evidence that defendant possessed child pornography, in prosecution for attempted coercion and enticement of a minor); *United States v. Kelly*, 510 F.3d 433 (4th Cir. 2007) (admission of 22-year-old conviction for prior attempted rape of a 12-year-old, in prosecution for traveling in interstate commerce for purpose of engaging in illicit sex); *United States v. Guidry*, 456 F.3d 493 (5th Cir. 2006) (admission of uncharged sexual assaults in trial of police officer charged with sexual assaults); *United States v. Seymour*, 468 F.3d 378 (6th Cir. 2006) (uncharged sexual assaults against adult females admissible in case charging child molestation offenses); *United States v. Breitweiser*, 357 F.3d 1249 (11th Cir. 2004) (admission of prior sexual conduct against minors); *United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001) (admission of witness testimony that defendant had sexually abused victim 20 years earlier).

This Court undertakes a three-part inquiry in determining whether to admit evidence under Rule 414: (1) whether the defendant is accused of an offense of child molestation; (2) whether the proffered evidence is proof of another child molestation or sexual assault; and, (3) whether the proffered evidence is relevant. *United States v. McHorse*, 179 F.3d 889, 897-98 (10th Cir. 1999); *Sioux*, 362 F.3d at 1244 ("Due to the striking similarities between these rules and the fact that they are in pari materia, we have followed decisions interpreting each of these rules individually in cases interpreting their companions."). Here, as noted in the government's notice, the evidence amply satisfies each prong.

**VI.   CONCLUSION**

The evidence at trial in this matter will establish each and every element of the offenses beyond a reasonable doubt.  For that reason, the government will ask, at the end of trial, that this Court find the defendant guilty on all counts.

Respectfully submitted this 3rd day of June, 2016.


JOHN S. LEONARDO
United States Attorney
District of Arizona

*Carmen F. Corbin*

CARMEN F. CORBIN
Assistant U.S. Attorney


*Erica L. Seger*
ERICA L. SEGER
Assistant U.S. Attorney


Copy of the foregoing served electronically or by
other means this 3rd day of June, 2016, to:

All ECF participants